**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **STATE OF CALIFORNIA,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 19-3281** |
| | : | |
| **TEVA PHARMACEUTICAL** | : | |
| **INDUSTRIES, LTD., <u>et al.</u>** | : | |
| | : | |
| **Defendants.** | : | |

_____

**Goldberg, J.**                                                                           **June 10, 2020**

<u>**MEMORANDUM**</u>

The matter before me is the last case remaining from a multi-party antitrust matter.  The parties involved have included a brand-name drug manufacturer, numerous generic drug companies, retail drug distributors, the Federal Trade Commission, States Attorneys General, direct purchasers, and end-payors.  On July 29, 2019, the State of California brought this action, <u>State of California v. Teva Pharmaceutical Industries, Ltd., et al.</u>, Civ. A. No. 19-3281, seeking approval of a settlement instituted on behalf of California natural persons injured by violation of the state antitrust laws by Defendants Cephalon, Inc. ("Cephalon"), Teva Pharmaceutical Industries Ltd. ("Teva"), Teva Pharmaceuticals USA, Inc. ("Teva USA"), and Barr Pharmaceuticals, Inc. ("Barr") (collectively, "Defendants").  On August 8, 2019, I granted preliminary approval of the Consumer Settlement Agreement and stipulated State Injunction Order.

The Attorney General of California now moves for final approval of both the Consumer Settlement Agreement and stipulated State Injunction Order.  Upon review of the parties' briefing

and considering the presentations at the final fairness hearing on February 26, 2020, I will grant the requested final approval.

## I.    FACTUAL HISTORY

### A.    Allegations in the Complaint

The State of California's ("California") Settlement Complaint was filed on July 29, 2019, alleging that Teva and its wholly-owned subsidiaries Cephalon, Teva USA, and Barr, coordinated to delay the launch of generic alternatives to the drug Provigil®, a wakefulness-promoting drug, in order to protect Provigil's monopoly profits.  Provigil is widely-prescribed for treatment of narcolepsy and other sleep disorders.  (Compl. ¶ 2.)

According to the Complaint, Cephalon, in an effort to delay generic competition, knowingly enforced on generic competitors an invalid patent that it obtained due to its material omissions and misrepresentations to the Patent and Trademark Office ("PTO").  Despite knowing that the patent was invalid and fraudulently procured, Cephalon filed patent infringement litigation against every company seeking to manufacture generic Provigil, all in an effort to delay generic entry.  (Id. ¶ 3.)  The generics responded with allegations that the patent was invalid.  (Id. ¶ 59.)

As set forth in the Complaint, the infringement actions settled and, in exchange for their agreement to delay generic entry, each generic competitor obtained a "large and unjustified" transfer of consideration.  Due to these "reverse-settlement" payments, generic competition did not commence until April 2012—giving Cephalon approximately six additional years of product exclusivity and monopoly profits that it would otherwise not have maintained.  The Complaint alleges that, without the reverse-settlement payments, generic versions of Provigil would have entered the market in 2006, saving California and its consumers hundreds of millions of dollars.  (Id. ¶¶ 4–5.)  Defendants Teva, Teva USA, and Barr were among the five generic drug

manufacturers that received reverse-settlement payments from Cephalon.  (Id. ¶¶ 66–67, 72–73.)
In 2008, Teva acquired Barr and, in 2011, Teva acquired Cephalon, resulting in the consolidation
of all Defendants into one entity ("Teva" or "Defendant").  (Id. ¶¶ 11–14.)

The Complaint further alleges that generic competition to Provigil was unlawfully delayed
from June 24, 2006 through December 31, 2012.  That delay allegedly resulted in harm not just to
California and its consumers, but also the United States at large.  (Id. at ¶¶ 74–83.)

### B.   California's Non-Public Investigation from 2009 to 2019

California began investigating the above allegations in 2009 with four other states (the
"Multistate Group").  Pursuant to California Government Code § 11183,[1] the investigation had to
be kept confidential.  That investigation was subsequently expanded to reflect the public interest
concerns and enforcement efforts of antitrust lawyers from the Offices of the Attorneys General
from over forty-five states (the "Multistate Investigation"). (Decl. of Cheryl Lee Johnson
("Johnson Decl."), ECF. No. 2-3, ¶¶ 3–4.)  The Multistate Investigation proceeded over many
years and involved the subpoena and synthesis of documents and expert reports gathered in the

---

[1]     This provision states:

> Except in a report to the head of the department or when called upon
> to testify in any court or proceeding at law or as provided in Secion
> 11180.5 or subdivisions (g) and (h) of Section 11181, an officer
> shall not divulge any information or evidence acquired by the officer
> from the interrogatory answers or subpoenaed private books,
> documents, papers, or other items described in subdivision (e) of
> Section 11181, of any person while acting or claiming to act under
> any authorization pursuant to this article, in respect to the
> confidential or private transactions, property or business of any
> person.  An officer who divulges information or evidence in
> violation of this section is guilty of a misdemeanor and disqualified
> from acting in any official capacity in the department.

Cal. Govt. § 11183.

action filed by the Federal Trade Commission ("FTC"), <u>FTC v. Cephalon, Inc.</u>, No. 08-2141 (E.D. P.A.) ("FTC Action), and by private litigants including a group of direct purchaser plaintiffs, <u>King Drug Co., et al. v. Cephalon, Inc., et al.</u>, No. 06-1797 (E.D. Pa.) ("DPP Case"), a group of end-payor plaintiffs, <u>Vista Healthplan, Inc. et al. v. Cephalon Inc. et al.</u>, No. 06-1833 (E.D. Pa.) ("EPP Case"), and a generic manufacturer and retail pharmacies, <u>Apotex, Inc. v. Cephalon, Inc., et. al</u>, No. 06-2768 (E.D. Pa.) ("Apotex Case").

Having compiled this information, the Multistate Group began settlement negotiations with Teva, culminating in a $125 million settlement of the Multistate Investigation in 2015 ("Multistate Settlement").  (Johnson Decl. ¶ 6.)  That settlement agreement was signed on July 28, 2016, and I granted preliminary approval on November 7, 2016.  <u>State of New York, et al. v. Cephalon, Inc.</u>, No. 16-4234 (E.D. Pa. Nov. 7, 2016).

California declined to participate in the Multistate Settlement because: (a) it did not include injunctive relief which California believed was important to create a vehicle for enforcement by the States to facilitate greater enforcement efforts against pay-for-delay schemes, and (b) California believed it should seek greater monetary recovery for its consumers than was available to it under the Multistate Settlement.  (Johnson Decl. ¶ 6.)  Accordingly, California withdrew from the Multistate Group and resumed its investigation, obtaining additional documents and rulings and initiating enforcement proceedings for documents in the California State Superior Court.  (<u>Id.</u> ¶¶ 7–10.)

## C.   <u>The Settlement</u>

California began settlement negotiations with Teva around April 2016, with discussions proceeding in earnest from January 2019 through July 2019.  (<u>Id.</u> ¶ 11.)  Ultimately, these

negotiations culminated in a settlement of the California Case in July 2019 (the "Settlement"). The Settlement reached between California and Teva contains the following provisions:

- Monetary Relief Pending Court Approval of the *Parens Patriae* Portion: Teva agreed to request disbursement from the FTC Settlement Fund to the State and its Eligible Consumers in the sum total of $69 million ("Settlement Payment"). The Settlement Payment has been received in full and is currently held in escrow awaiting the final approval and disbursement order. (Decl. of Pamela Pham ("Pham Decl.") ¶ 5.) Pursuant to the Settlement Agreement, the State has allocated $25,250,000 (36.6% of the Settlement Payment) to California residents, who comprise approximately 12% of the nation's population (the "Consumer Settlement"), and has directed its deposit into the escrow account designated as the "Consumer Fund." (Id. ¶ 6.) This portion of the Settlement Payment is subject to Court approval as it has been obtained through California's *parens patriae* authority. [2] The remaining $43,750,000 (63.4% of the Settlement Payment) has been deposited into the State Proprietary Fund and is currently held in escrow. (Id.) The money in the State Proprietary Fund is not subject to Court approval.

- Injunctive Relief Through February 21, 2020 Pending Court Entry: Teva agreed to be bound by the stipulated State Injunction Order, which adopts and incorporates all of the operative terms of the Revised FTC Injunction entered by this Court on February 21, 2019, in the FTC's Action against Teva. Teva agreed that, as part of this injunctive relief, California would receive the same reports, documents, agreements, and information that the FTC received under its parallel injunction, as well as the rights to participate in any

---

[2]  A *parens patriae* theory allows a state to bring suit on its own behalf to protect the well-being of its residents. Broselow v. Fisher, 319 F.3d 605, 608 (3d Cir. 2003) (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592 (1982)).

inspections or interviews pursued by the FTC under the Revised FTC Injunction and to consult with the FTC on enforcement of the Revised FTC Injunction.  Teva further agreed to comply with the State Injunction Order pending its entry by the Court per the terms of this Settlement Agreement.

- <u>Effective Date</u>:  In light of the fact that Court approval is required for the Consumer Settlement, the Parties agreed that the Effective Date of the entire Settlement Agreement would key off of the finality of the Consumer Settlement.  Both the Consumer Fund and the State Proprietary Fund will remain in escrow until then, but, in the interim, the Escrow Agent may use the proceeds in the discretionary State Proprietary Fund to pay settlement administration costs, expenses, and fees incurred in the approval process.

### D.     **Notice**

On August 8, 2019, I entered an order for preliminary approval of the Consumer Settlement.  Following entry of the Preliminary Approval Order, Class Counsel worked with Settlement Administrator A.B. Data, Ltd. ("Settlement Administrator" or "A.B. Data") to implement the approved notice program ("Notice Program").  The California State Attorney General coordinated notice with the end-payor plaintiff class in <u>Vista Healthplan, Inc. v. Cephalon, Inc.</u>, 06-cv-1833 (E.D. Pa.), who sought approval of its own settlements.  The Notice Program consisted of:

- Direct notice to over one million potential Eligible Consumers and EPP Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies;

- Direct notice via United States Mail to 42,793 consumer names and addresses that were identified in the Multistate Action who may be potential Eligible Consumers and EPP Class Members;

- Publication notice in national consumer magazines, including <u>Better Homes & Gardens</u>, <u>People</u>, and <u>Time</u>;

- Publication notice of the Consumer Settlement in two Sunday editions in forty-two (42) California newspapers;

- Internet banner and newsfeed ads on multiple networks, including social media and targeted websites, such as Facebook, Google Networks, Google Ad/Words, YouTube, and Pinterest;

- Distributing notice via PR Newswire's US1 Newsline on September 4, 2019;

- Distributing notice of the Consumer Settlement via California Newswire and the California Hispanic Newswire on September 4, 2019;

- Developing and launching a dedicated information website for the California Settlement and EPP Case Settlement at ProvigilSettlement.com;

- Establishing a dedicated toll-free telephone number with an interactive voice response system and live operators; and

- Additional notice to potential Eligible Consumers through the Attorney General's press conference and press releases concerning both settlements.  The press conference was recorded and made available through the Attorney General's media library and on YouTube.  The press release regarding the Consumer Settlement, as well as updated information regarding the Settlement and Settlement Website can be found online.

(Miller Decl. ¶ 3; Pham Decl. ¶ 15.)

E.    __Distribution Plan__

Upon final approval of the Consumer Settlement and its Distribution Plan, the Consumer Fund and all accrued interest will be distributed to Eligible Consumers first through direct cash payments of claims from Eligible Consumers that have been vetted for legitimacy, and thereafter through *cy pres* distribution[3] of any portion that remains unclaimed.   (Johnson Decl., Ex. 4.) Neither proof of purchase nor out-of-pocket expense is required to file a claim.   Rather, each claimant must simply state under oath that each claimed purchase was made during the relevant period for personal use or by the claimant as a caregiver, and that the claimant was a California resident at the time of purchase.   (Decl. of Eric Miller ("Miller Decl.), ECF No. 2-4, Ex. 2.)

Plaintiff avers that, because the relevant products are controlled substances, not all Eligible Consumers will file claims.   (Pham. Decl. ¶ 10.)   As such, any unclaimed finds will be subject to *cy pres* distribution to eligible public interest organizations via a competitive grant-making process administered by a neutral third-party *Cy Pres* Administrator.   (Pham Decl. ¶ 13.)   The State has

---

[3]     The United States Court of Appeals for the Third Circuit explained *cy pres* distribution as follows:

> When class actions are resolved through settlement, it may be difficult  to distribute  the  entire  settlement  fund,  after  paying attorneys' fees and costs along with fund administration expenses, directly to its intended beneficiaries—the class members.   Money may remain unclaimed if class members cannot be located, decline to file claims, have died, or the parties have overestimated the amount projected for distribution for some other reason.   It may also be economically or administratively infeasible to distribute funds to class members if, for example, the cost of distributing individually to all class members exceeds the amount to be distributed.   In these circumstances, courts have permitted the parties to distribute to a nonparty (or nonparties) the excess settlement funds for their next best  use—a  charitable  purpose  reasonably  approximating  the interests pursued by the class.

In re Baby Products Antitrust Litigation, 708 F.3d 163, 168–69 (3d Cir. 2013).

engaged Mr. Harry Snyder as the *Cy Pres* Administrator, and Mr. Snyder has supplied a declaration describing the proposed competitive grant-making process.  (Decl. of Harry Snyder ("Snyder Decl.").)

The last day for California's Eligible Consumers to submit claims to the Consumer Settlement for purposes of receiving a direct cash payment was January 15, 2020.  As of the final fairness hearing date on February 26, 2020, Claims Administrator A.B. Data had received 10,412 timely Claim Forms.[4]  (Supplemental Decl. of Eric Miller ("Supp. Miller Decl.") ¶ 3.)  During processing, A.B. Data identified 4,394 valid claims for 155,341 prescriptions and will make payments to those claimants out of the Consumer Fund as permitted by the Court.  Applying the formula in the Distribution Plan, A.B. Data will thus pay out at least $6,629,953.88 directly to claimants without further review of their claims.  (Id. ¶ 5.)

Of the remaining claims, A.B. Data has identified 1,179 claims that are fraudulent and will be rejected.  (Id. ¶ 6.)  The last 4,839 claims are deficient or contain one or more indicia of invalidity (*e.g.*, lack of signature, failure to provide number of prescriptions purchased, failure to check the Eligible Claimant box, etc.) and will require further vetting and verification before payments will be made.  (Id. ¶ 7.)  Certain claimants will be sent a letter identifying the deficiency and will be given an opportunity to correct the deficiency and resubmit the claim.  (Id.)

Following this further vetting and verification of claims, and assuming claimants who initially failed to sign the Claim Form or check the Eligible Claimant box correct those deficiencies

---

[4]     A.B. Data (1) conferred with the California Attorney General to further define guidelines for the evaluation of claims; (2) sorted, date-stamped, and, bar-coded incoming mail, separating it into Claim Forms and administrative mail; (3) imaged all hardcopy Claim Forms and administrative mail into a secure database; (3) entered the information from each Claim Form received by mail or submitted online, including name(s), address(es), and information related to the claimant's purchases of Provigil®, Nuvigil®, or generic versions of Provigil®; and (5) stored all original Claim Forms and administrative mail in a secure, off-site facility.  (Id. ¶ 4.)

and resubmit, A.B. Data expects to distribute funds to at least 6,977 claimants in the total amount of $10,090,640.34.  (Id. ¶ 8.)

### F.   Motion for Final Approval

In January 2020, the California Attorney General filed the present Motion for Approval of the Consumer Settlement and Entry of the Stipulated State Injunction Order.

I held a final fairness hearing on February 26, 2020, on both this Settlement and the EPP Case Settlement.

## II.   FAIRNESS OF THE SETTLEMENT

Class actions settlements are  distinguished  from  those  in  most  normal  suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court."[5]  Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995).  This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims."  In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).  A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate."  In re Nat'l Football League

---

[5]     State laws authorizing the Attorney Generals to bring and settle actions as *parens patriae* set forth no specific standards for approving a proposed settlement. "[C]ourts generally have utilized the Rule 23 standards when evaluating *parens patriae* actions for settlement purposes under the federal statute."  In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 375 n.9 (D.D.C. 2002) (citing New York v. Reebok Int'l, Ltd., 903 F. Supp. 532 (S.D.N.Y. 1995)); see also In re Cardizen CD Antitrust Litig., 218 F.R.D. 508, 522 n.11 (E.D. Mich. 2003) ("*Parens patriae* settlements entered into by state Attorneys General are analyzed under a standard and procedure similar to that used to consider private class action settlements under Fed. R. Civ. P. 23); In re Mid-Atl. Toyota Antitrust Litig., 564 F. Supp. 1379, 1383 (D. Md. 1983) ("Similar standards should govern judicial review of proposed settlements in both *parens patriae* actions and private class actions.").

Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e)(2)).  The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished."  In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001).  "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate."  G.M. Trucks, 55 F.3d at 785 (quotations omitted).  While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806).

The United States Court of Appeals for the Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), has directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  Id. at 232 n.18; see also In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).

The Third Circuit, in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), has also "identified certain factors which district courts may employ in informing their discretion before granting final approval to  the class action settlement."  Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh).  "[T]he district court must

make findings as to each of the nine <u>Girsh</u> factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)."  <u>In re Pet Food Prods. Liab. Litig.</u>, 629 F.3d 333, 350 (3d Cir. 2010).  The <u>Girsh</u> factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>Girsh</u>, 521 F.2d at 157.

Subsequent to <u>Girsh</u>, the Third Circuit, in <u>In re Prudential Insurance Company America Sales Practice Litigation Agent Actions</u>, 148 F.3d 283 (3d Cir. 1999), cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional <u>Girsh</u> factors" when appropriate.  <u>Id.</u> at 323.  The additional factors for consideration cited by the <u>Prudential</u> court include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id.  These <u>Prudential</u> factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." <u>In re Pet Food Prods.</u>, 629 F.3d at 350.

Finally, in <u>In re Baby Products Antitrust Litigation</u>, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." <u>Id.</u> at 174.  "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." <u>Id.</u>

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. <u>Girsh</u>, 521 F.2d at 156.  There remains an overriding public interest in settling class action litigation, and it should therefore be encouraged.  <u>See</u> <u>G.M. Trucks</u>, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); <u>In re Sch. Asbestos Litig.</u>, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").  As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." <u>In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig.</u>, No. 09-md-2034, 2019 WL 4645331, at *10 (E.D. Pa. Sept. 24, 2019) (quoting <u>In re Baby Prods.</u>, 708 F.3d at 175)).

With these standards in mind, my review of the Consumer Settlement entails a multi-pronged analysis.  I first address whether the Consumer Settlement is entitled to a presumption of fairness as described in the Cendant case.  I will then individually address the Girsh, Prudential and Baby Products factors.

### A.        Presumption of Fairness

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where:  "(1)  the settlement negotiations  occurred  at  arm's  length;  (2)  there  was  sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  In re Cendant, 264 F.3d at 232 n.18; see also In re NFL, 821 F.3d at 436.  All of these factors are satisfied here.

First, it is undisputed that the settlement negotiations occurred at arm's length.  California originally began settlement negotiations with Teva as part of the Multistate Group.  The Multistate Group reached the Multistate Settlement, which I approved in 2017.  California, however, declined to join the Multistate Settlement because it believed the allocation to California and its consumers was lower than what it should seek, and because the Multistate Settlement provided no injunctive relief  to  facilitate  state  enforcement  efforts  against  future  pay-for-delay  schemes.    After withdrawing  from  the  Multistate  Group  in  2016,  California  resumed  its  investigation  and ultimately reached its own settlement with Teva in 2019.  This Settlement was a result of lengthy and robust arms-length negotiation.  (Johnson Decl. ¶¶ 7–11.)

Second, sufficient discovery and investigation occurred here.  The Settlement comes after ten years of investigation by California of the pay-for-delay allegations against Teva.  California had  the  benefit  of  the  discovery  done  by  the  Multistate  Group,  which  consisted  of  Attorneys General  from  over  forty-five  states.    That  Group  subpoenaed  and  synthesized  key  documents  and

expert reports from the FTC and private litigant actions, which had already spent several years conducting exhaustive discovery and gathering experts.   Ultimately, California believed that discovery was insufficient and, between 2016 and 2019, assembled a team of antitrust attorneys, senior legal analysts, and law student interns to conduct further discovery and investigation of the matter.   To the extent documents were not gathered by the Multistate Group, California's team also subpoenaed and evaluated records in the FTC Action, the DPP Case, the EPP Case, and the Apotex Case.

Third, lead counsel representing California—Cheryl Lee Johnson and Pamela Pham—are highly experienced in antitrust litigation.   Together, they have been practicing complex and antitrust litigation for more than sixty years and have settled numerous major antitrust cases involving consumer claims in the form of California's own *parens patriae* claims or in coordination with private class actions.  (Johnson Decl. ¶ 12.)  Ms. Johnson, in particular, has been investigating and litigating pay-for-delay violations for more than twelve years, was an integral part of the lawsuit that went before the United States Supreme Court in Federal Trade Commission v. Actavis, 570 U.S. 136 (2013), has authored numerous *amicus* briefs concerning pay-for-delay issues, has taught and chaired panels and webinars on pay-for delay issues, has written articles on pay-for-delay, has helped author legislation in the California Assembly and Senate on the structure by which pay-for-delay agreements should be adjudicated, and has been the Editor-in-Chief of the California State Antitrust and Unfair Competition treatise for twenty years.  (Id. ¶¶ 13–15.)

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable.   Following the expansive notice to California's Eligible Consumers, only two objections were filed, one of which is from a New Mexico resident without

any claim to residency in California during the relevant period.  Over 10,000 Claim Forms have been received, and there have been no requests for exclusion received from any consumer.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness.  While this presumption does not obviate the need for scrupulous analysis under the <u>Girsh</u>, <u>Prudential</u>, and <u>Baby Product</u> factors, it does skew the analysis in favor of approving the Settlement.

    **B.**    **Application of the *Girsh* Factors**

        1.    <u>Complexity, Expense, and Likely Duration of the Litigation (Factor 1)</u>

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'"  <u>In re Warfarin</u>, 391 F.3d 535–36 (quoting <u>In re Cendant</u>, 264 F.3d at 233)); <u>see also</u> <u>In re NFL</u>, 821 F.3d at 437.

The present suit involves complicated antitrust and patent issues in the realm of pharmaceutical manufacturing.  "An antitrust class action is arguably the most complex action to prosecute . . ."  <u>In re Linerboard Antitrust Litig.</u>, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); <u>see also</u> <u>In re Flonase Antitrust Litig.</u>, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."). Although California had been actively investigating this matter for years, it had not yet filed a lawsuit, meaning that it would have had to start from the beginning while the other, related private actions were all being resolved.  The Consumer Settlement therefore avoided the need for difficult and expensive litigation, including additional discovery periods, as well as a multi-week trial involving numerous <u>Daubert</u> motions, numerous motions *in limine*, fact witness testimony, and costly expert witness testimony in scientific and regulatory areas.

Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Consumer Settlement.  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

       2.       Reaction of the Potential Class Members to the Settlements (Factor 2)

The second Girsh factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002) (quoting In re Prudential, 148 F.3d at 318).

Here, as of the date of the Final Fairness Hearing, the Settlement Administrator received 10,412 timely claims to the Consumer Settlement.  (Supp. Miller Decl. ¶ 3.)  No member of the *parens patriae* group has opted out of the Consumer Settlement, highlighting the overall positive reaction of the group.

Two objections to the proposed Consumer Settlement were filed, neither of which I find warrants non-approval.  Mr. Daniel Dunham generally objects that "[t]he actions alleged, if true, would require penalties in excess of profit to have any deterring effect" and suggests that "the fund to be distributed be much larger, since victims can obtain nothing more than what was lost due to the alleged behavior, and the total judgment has a finite limit."  He believes that "there is no reason a company should retain any of the profit that is earning using unlawful methods."  (Daniel Dunham Obj., ECF No. 22)

Mr. Dunham, however, has never been a California resident and, thus, is not a member of California's Consumer Settlement.  Accordingly, Mr. Dunham does not have standing to object to the terms of the Settlement.[6]  See In re Sunrise Secs. Litig., 131 F.R.D. 450, 459 (E.D. Pa. 1990) ("[N]on-class members have no standing to object, pursuant to a Rule 23(e) notice directed to class

---

[6]     Mr. Dunham's objection has been considered in connection with the final approval of the EPP Case Settlement.

members, to a proposed class settlement." (quoting <u>Gould v. Alleco, Inc.</u>, 883 F.2d 281 (4th Cir. 1989)).  I will therefore overrule Mr. Dunham's objection.

The second objection comes from Mr. Carlton Davis, who contends that the Cephalon Settlement will be an insufficient deterrent because he understood that Cephalon "accrued as much as $47.25 billion in overcharges" and that the Consumer Settlement amount will not impede the illicit conduct because it is a "mild slap on the wrist to a greed-addicted company."  He also believes that the Consumer Settlement "does nothing to address the real cost inflicted" on society and is "woefully inadequate to compensate consumers" because only $20 million is going to be paid out to the class.  He urges that he should be compensated for his time and expenses in pursuing his claim, in the amount of $8,000. (Carlton Davis Obj. ECF No. 22.)

I find no basis to sustain this objection.  As a primary matter, Mr. Davis's objection appears to rely on an overly-inflated overcharge number.  As noted by the EPPs in their Motion for Approval of Settlement, the overcharge damages were not calculated to be $47.25 billion, as Mr. Davis believes, but rather were calculated to be approximately $1.244 billion to all end-payors, of which California consumers represent only a fraction.  (Meltzer Decl. for Preliminary Approval, Civ. A. No. 06-1833, ECF No. 586, Ex. 18.)  Consistent with this calculation, the total Settlement negotiated by California is $69 million.  Of that amount, $25 million is allocated to the Consumer Settlement, which seeks to distribute all of those funds directly to California Consumers and allows them to recover up to 200% of their purchases (or $42.68 per prescription).

Mr. Davis's request for $8,000 in personal attorneys' fees—unaccompanied by any documentation—has no legal basis.  "Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee."  <u>In Rent-Way Secs. Litig.</u>, 305 F. Supp. 2d 491, 520 (W.D. Pa. 2003).  As Mr. Davis has not demonstrated that

his participation has enhanced the benefits to the consumers under the settlement, he is not entitled to any fees.

While I appreciate and carefully consider the objections of those who take the time to participate in this process, I do not find that either of these objections raise valid concerns to the fairness and adequacy of the Consumer Settlement.  By contrast, the more than 10,000 timely claims reflect significant support for the Consumer Settlement.  As a "small proportion of objectors does not favor derailing [the] settlement," Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993), I find that this factor weighs in favor of approval.

3.      Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—"courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813).  "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair."  Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

As discussed above, the Consumer Settlement comes on the heels of a ten-year investigation by the California Attorney General, during which time multiple experienced antitrust lawyers obtained relevant litigation records, discovery materials, and trial briefs in the other actions, including the FTC Action, the DPP Case, the EPP Case, and the Apotex Case.  California's lawyers reviewed the extensive discovery produced in those cases and, believing that the State's interests were not being met with the Multistate Group, undertook their own additional review and negotiations.  Ultimately, after a decade of work, California reached the present Settlement on

behalf of both the State and its residents.  As such, this factor weighs heavily in favor of final approval of the Consumer Settlement.

4.    <u>Risks of Establishing Liability & Damages (Factors 4 and 5)</u>

Factors four and five of the <u>Girsch</u> analysis "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  <u>In re Warfarin</u>, 391 F.3d at 537.

Both factors support approval of the Consumer Settlement.  A favorable outcome was far from guaranteed in any litigation pursued by California.  Like the other private litigants, California put forth novel theories of antitrust liability, complicated by difficult patent issues, in an ever-changing legal landscape.  Defendants—large pharmaceutical companies—had immeasurable resources to proceed to and through trial.

Even if California was successful in establishing an unlawful reverse-settlement payment <u>Actavis</u> scheme with respect to Provigil, it faced an uncertain battle in establishing causation and damages.  "California would have had to estimate what its state agencies and consumers would have paid had the Teva defendants *not* allegedly delayed generic competition to Provigil® throughout the Relevant Period beginning back in 2006."  (Calif. Mem. Supp. Mot. For Final Approval 18 (emphasis in original).)  Various factors would have complicated this calculcation, including how many generic drug manufacturers would have launched "at risk," when each would have launched, whether a generic that launched at risk would succeed in defeating the pending patent infringement case, what generic and branded drug pricing would be in the "but for" world, and how many branded and generic purchases would be made by state entities and consumers. (Pham Decl., Ex. 3, pp. 18–19.)  "The dispute over damages would likely have resulted in an

expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data." McDonough, 80 F. Supp. 3d at 644.

Ultimately, the Consumer Settlement provides the certainty of a $25 million immediate recovery to eligible California Consumers without subjecting California to the rigors of a difficult trial.  As such, I find these factors weigh in favor of the Consumer Settlement.

5.     Likelihood of Obtaining and Keeping Class Certification Through Trial (Factor 6)

The  sixth Girsh factor "measures  the  likelihood  of  obtaining  and  keeping  a  class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." In re Warfarin, 391 F.3d at 537 (internal quotations & citation omitted).

This factor is irrelevant here as this action was brought by the State of California in both its sovereign and proprietary capacity on behalf of state entities that purchased Provigil® and Nuvigil®, and under its *parens patriae* authority on behalf of natural persons who were California residents and purchased the relevant products during the relevant time period.  It does not need to seek class certification.  Accordingly, this factor does not weigh either for or against approval of the Consumer Settlement.

6.     Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The seventh Girsh factor—the ability of the defendants to withstand a greater judgment—generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded  but  the  defendant's  financial  circumstances  do  not  permit  a  greater settlement." Reibstein, 761 F. Supp. 2d at 254.  The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the Consumer and TPP Class Members are entitled to under the theories of liability that existed at

the time the settlement was reached." In re Warfarin, 391 F.3d at 538.  Where the defendant never professed an ability to pay more during settlement negotiations, the defendant's financial wherewithal does not undermine the reasonableness of the settlement.  In re Comcast Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 383 (E.D. Pa. 2019).

Here, there is no question that the Defendant's total resources exceed the Settlement amount.  As Defendant did not profess any inability to pay during settlement negotiations, however, that factor does not appear to have come into play during the settlement negotiations. Defendant's ability to pay is therefore irrelevant in determining the fairness of the Settlement and I decline to give it any weight.

7.   Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re Warfarin, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806).   In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation."  In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4,

2001).  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.  The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under <u>Girsh</u>."  <u>In re Cendant Corp. Sec. Litig.</u>, 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), <u>aff'd</u>, 264 F.3d 201 (3d Cir. 2001).

The Consumer Settlement here is reasonable in light of the best possible recovery.  As set forth above, the Consumer Settlement provides $25.25 million to Eligible Consumers, plus ongoing injunctive relief to facilitate state enforcement efforts against future pay-for-delay agreements.  That $25.25 million must be considered in connection with the $43.75 million being deposited into the State Proprietary Fund.  This total amount was negotiated after California rejected the settlement amount offered to it through the Multistate Settlement and chose to continue its investigation and negotations in order to obtain a higher recovery on behalf of its citizens.  The Consumer Fund, including all interest accruing thereon, will be distributed to Eligible Consumers first through direct cash payments to claimants whose claims have been vetted for legitimacy, and thereafter through *cy pres* distribution.  The injunction portion of the Settlement allows California to further protect consumers from alleged anticompetitive conduct.

The Consumer Settlement's reasonableness is abundantly obvious when considered in light of the attendant risks of litigation.  The Consumer Settlement was achieved after ten years of investigation into a matter that offered no guarantee of recovery.  Certainly, the legal theories were novel and challenging to prove, and the amount of recoverable damages was far from guaranteed.  As noted by California, "continued prosecution of . . . its federal and state antitrust and consumer protection law claims would have necessarily required the State to file suit leading to the re-

litigation of the factual and legal issues already raised and resolved in the other actions, and ultimately would have required a substantial trial of the action, preceded by complicated and time consuming pretrial proceedings, addressing, *inter alia*, Daubert and *in limine* motions."  (Pham. Decl. ¶ 4.)  The trial would have spanned multiple weeks and included fact and expert testimony, ultimately increasing the fees, costs, and expenses without the certainty of relief.   "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness."  Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth Girsh factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth Girsh factors weigh in favor of approval of the Settlement.

### 8.    Summary of the *Girsh* Factors

In sum, Girsh factors one through five, eight, and nine favor approval of the Consumer Settlement.  Factor six—the likelihood of obtaining and keeping class certification during trial— and factor seven—the ability of the Defendants to withstand a greater settlement—are neutral and do not persuade me either way.  Although the Girsh factors are simply a guide, I find that, under these considerations, the Consumer Settlement is fair and reasonable.

### C.    **The *Prudential* Factors**

As set forth above, the Prudential factors involve multiple additional considerations, including:  (1)  "the maturity of the underlying substantive issues, as measured by experience in

adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential, 148 F.3d at 323.  Only the Prudential factors relevant to the litigation in question need be addressed.  Id. 323–24; In re Cigna-American Specialty Health Admin. Fee Litig., No. 16-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues— substantially mirrors Girsh factor three, the stage of the proceedings.  Under this factor, the advanced development of the record weighs in favor of approval.  See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").  As discussed previously, the Consumer Settlement came on the heels of ten years of active investigation during which discovery was obtained from multiple other, hotly-litigated private actions.  The California team of antitrust lawyers had the benefit of assessing the strength and weaknesses of their case based on this discovery, the Defendants' motions, and the Supreme Court ruling in Actavis.  Moreover, the Consumer Settlement resulted from extensive negotiations undertaken both with the Multistate Group and again on an individual basis.  Accordingly, I find that the Consumer Settlement was premised on a significantly mature record.

Factors two and three look at the outcomes of claims by other classes and other claimants. Here, Teva faced antitrust claims from multiple other claimants and classes including the Federal Trade Commission, generic manufacturer Apotex, a group of retailer pharmacy chains, a class of direct purchaser plaintiffs, a class of end payor plaintiffs, and a group of States' attorneys general, all of whom reached settlements allowing for the recovery of overcharge damages. Consistent with these settlements, the Consumer Settlement permits Class Members to potentially recover the full amount of overcharge damages they suffered as a result of the alleged anticompetitive conduct. Indeed, the Consumer Settlement is cumulative of the portion of the EPPs' class action settlement that also applies to California's Eligible Consumers. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. The Notice to Potential Eligible Consumers here directed that if a consumer wished to exclude him/herself from the Settlement, he or she could send a written "Request to Opt Out" to the Settlement Administrator so that it was received by December 6, 2019. The written request had to include: (a) the consumer's name, address, telephone number, and signed statement that he or she wished to opt out of the Settlement; and (b) the case name and number: <u>State of CA v. Teva Pharmaceutical Industries, Ltd., et al.</u>, Civil No. 19-CV-03281. (Miller Decl. ¶ 19.) As of the above date, the Settlement Administrator has received zero requests to opt out. (Miller Decl. ¶ 20.)

The fifth factor—the reasonableness of attorneys' fees—has no bearing on the Consumer Settlement. The entire $25.25 million of the Consumer Fund, which is the only portion of the entire California Settlement subject to court approval, will be distributed either directly to

consumers or through a *cy pres* distribution.  The California Attorney General's team of lawyers will take no attorneys' fees from this Consumer Fund.

Finally, under the sixth factor, I find that the procedure for processing individual claims is both fair and reasonable.  In order to submit claims, Eligible Consumers need not provide either proof of purchase or out-of-pocket expense.  Rather, each claimant must simply state under oath that each claimed purchase was made during the relevant period for personal use or by the claimant as a caregiver, and that the claimant was a California resident at the time of purchase.  (Decl. of Eric Miller ("Miller Decl.), ECF No. 2-4, Ex. 2.)  Those claims are then vetted for validity and deficiencies.  Invalid claims are rejected, while claimants filing deficient claims are given an opportunity to cure those deficiencies.  (Supp. Miller Decl. ¶¶ 6–7.)

Overall, the Prudential factors raise no concerns with the fairness of the Consumer Settlement.  The Consumer Settlement was reached at mature stage of the litigation, and its terms appropriately set forth how to file a claim, how the monies will be distributed, and how to opt out of the Consumer Settlement.  Moreover, the Settlement Consumer is consistent with those obtained by the other claimants in the related actions.  As such, I find the Prudential factors favor approval of the Consumer Settlement.

### D.  Baby Products Direct Benefit Factor

The final factor I must consider in my analysis of the Consumer Settlement's fairness is "the degree of direct benefit provided to the class."  In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013); see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

"[D]irect distributions to the class are preferred over *cy pres* distributions."  In re Baby Prods., 708 F.3d at 173.  However, "a district court does not abuse its discretion by approving a

class action settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury" and "[i]nclusion of a *cy pres* provision by itself does not render a settlement unfair, unreasonable, or inadequate." Id. at 172–73.  The Third Circuit has remarked that "[t]o account for the inferiority of *cy pres* distributions, the [American Legal Institute] has published guidelines limiting them to instances where further individual distributions are infeasible."  Those guidelines provide in pertinent part:

> If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

Id. at 173 (quoting American Law Institute ("ALI"), Principles of the Law of Aggregate Litig. § 3.07(b)).  "The ALI does not explain further what 'other specific reasons' would justify a *cy pres* distribution."  Id.  Thus, in determining whether a settlement containing a *cy pres* provision is fair, reasonable, and adequate, the Third Circuit has held that "a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id. at 174.

Here, the Distribution Plan provides that upon final approval, the Consumer Fund and all accrued interest will be distributed to Eligible Consumers through direct cash payments of claims from Eligible Consumers that have been vetted for legitimacy.  (Johnson Decl., Ex. 4.)  Depending on the number of claims, each Eligible Consumer will be entitled to a minimum of 100% and up

to a maximum of 200% recovery for each eligible prescription.  (Id.)  Because the relevant products are controlled substances, however, not all Eligible Consumers will file claims.  (Pham. Decl. ¶ 10.)  Thus, only once all valid and eligible Consumer claims are paid will any unclaimed finds be subject to *cy pres* distribution to eligible public interest organizations via a competitive grant-making process administered by a neutral third-party *cy pres* administrator.  (Pham Decl. ¶ 13.)

As of the last day for California's Eligible Consumers to submit claims, Claims Administrator A.B. Data had received 10,412 timely Claim Forms.  (Supp. Miller Decl.) ¶ 3.)  A.B. Data identified 4,394 claims for 155,341 prescriptions as valid and will make payments of approximately $6,629,953.88 total to those claimants out of the Consumer Fund as permitted by the Court.  A.B. Data has identified 1,179 claims that are fraudulent and will be rejected.  (Id. ¶ 6.)  The last 4,839 claims are deficient or contain one or more indicia of invalidity and will require further vetting and verification before payments will be made.  (Id. ¶ 7.)  Certain claimants will be sent a letter identifying the deficiency and given an opportunity to correct the deficiency and resubmit the claim.  (Id.)

The State has engaged Mr. Harry Snyder, who is not an employee of the State of California, as the neutral *Cy Pres* Administrator.  Mr. Snyder explains that "the paramount goal of the *cy pres* distribution plan will be to identify uses for the residual funds that further the goals of the lawsuit by benefiting the class of California consumers who were harmed by the conduct at issue in the lawsuit and preventing potential future harm that might be caused by such conduct."  (Snyder Decl. ¶ 9.)  He goes on to describe, in detail, the process of soliciting, reviewing, and approving grant applications for *cy pres*  grants.  (Id. ¶ 10(a)–(i).)  Mr. Snyder's compensation will be set as a percentage of the residual settlement funds.  (Id. ¶ 11.)  Finally, Mr. Synder opines, based on his expertise in handling *cy pres* distributions, that the Distribution Plan here "will be the best means

of ensuring there is a nexus between the use of the residual funds and the goals of the lawsuit, will ensure the residual settlement funds are put to their next best use, and will provide a significant indirect benefit to the class of persons harmed by the conduct at issue in this case."  (Id. ¶ 13.)

I find this Settlement both fair and reasonable as it provides for a direct benefit for any eligible consumer who chooses to file a claim, and reimburses that consumer based on the type and extent of his/her injuries.  However, and with the understanding that the product at issue is a controlled substance for which many eligible consumers will not want to file claims, the Consumer Settlement provides for an appropriate use of the remaining Settlement Funds through *cy pres* distribution.

### E.   Conclusion as to Fairness of the Settlement

In light of the foregoing, I find that the Consumer Settlement is fair, reasonable, and adequate.  Lending the Settlement the requisite presumption of fairness, I note that all but two (both of which are neutral) of the Girsh factors, all but one (which is neutral) of the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval. Accordingly, I will grant final approval to the Settlement.

## III.   APPROVAL OF DISTRIBUTION PLAN

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself.  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015).  "Therefore, the proposed plan needs to be fair, reasonable and adequate."  Id. (citing In re Baby Prods., 708 F.3d at 174).  "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'"  Sullivan v. DB Invs., Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000).  Repeatedly, courts have approved of similar plans of allocation.  See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses . . . in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade.  Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

The Distribution Plan here is fair, reasonable, and adequate.  Approximately $24,326,207.25 is available for distribution from the Consumer Fund.  (Pham Decl. ¶ 7.)  Upon final approval of the Consumer Settlement and its Distribution Plan, the Consumer Fund and all accrued interest will be distributed to Eligible Consumers first through direct cash payments of

claims from Eligible Consumers that have been vetted for legitimacy, and thereafter through *cy pres* distribution.  (Johnson Decl., Ex. 4.)  With respect to the direct cash payments, Eligible Claimants will be reimbursed solely based on the number of prescriptions of the relevant products made during the  relevant time period for the claimant's personal use or by the claimant as a caregiver, and while the Claimant was a resident of California.  (Johnson Decl., Ex. 4.)

The Distribution Plan defines the valuation of each reported prescription as follows:

> Each California Claimant shall be entitled to claim the Recovery Per Prescription for each prescription filled as reported on that claimant's Claim Form and vetted for legitimacy by the Claims Adminsitrator.  To more fully compensate California Eligible Consumers and incentivize them to submit claims, if the proportion of Total California Prescriptions submitted for claims (the "Claims Rate") is 20% or less, each California Claimant shall be entitled to receive 200% of his or her Recoveries Per Prescription, or $42.68 per prescription.  If the claims Rate is between 20% and 40%, each California Claimant shall be entitled to receive 150% of his or her Recoveries per Prescription, or $32.01.  If the Claims Rate is 40% or greater, each California Claimant shall receive 100% of his or her Recoveries Per Prescription.

(Id.)  In other words, in no event shall an Eligible Claimant receive less than 100% recovery of his or her injuries, but it is possible, depending on the number of claims, that an Eligible Claimant may receive a recovery of twice his or her injuries.

Finally, as noted above, any unclaimed finds will be subject to *cy pres* distribution to eligible public interest organizations via a competitive grant-making process administered by a neutral third-party *Cy Pres* Administrator, Harry Snyder.  (Pham Decl. ¶ 13.)  Such *cy pres* distribution ensures that, after claimants are directly compensated, non-claimants who were also harmed receive an indirect benefit from the funds.  (Snyder Decl.13.)

Accordingly, I will grant final approval of the Distribution Plan.

**IV.     ENTRY OF THE STATE INJUNCTION ORDER**

Finally, I will grant entry of the stipulated State Injunction Order as it is substantially similar to the stipulated injunction order I previously entered on February 21, 2019 in the FTC Action.  The State Injunction Order here allows California, like the FTC, to have the necessary tools to ensure Defendant's compliance with the law and protect consumers from further anticompetitive conduct.

**V.      CONCLUSION**

In light of the foregoing, I will grant Final Approval to the California Settlement.  I will further approve the Distribution Plan and enter the stipulated State Injunction Order.

An appropriate Order follows.